# Illinois Official Reports

## Appellate Court

---

***ManorCare Health Services, LLC v. Illinois Health Facilities & Services Review Board*,
2016 IL App (2d) 151214**

---

| | |
|---|---|
| Appellate Court Caption | MANORCARE HEALTH SERVICES, LLC; HCR HEALTHCARE, LLC; and HCR MANORCARE, INC., Plaintiffs-Appellees, v. THE ILLINOIS HEALTH FACILITIES AND SERVICES REVIEW BOARD; KATHRYN J. OLSON, as Chair of the Illinois Health Facilities and Services Review Board; JOHN HAYES, as Vice Chair of the Illinois Health Facilities and Services Review Board; PHILIP BRADLEY, JAMES J. BURDEN, DEANNA J. DEMUZIO, DALE GALASSIE, ALAN GREIMAN, DAVID PENN, and RICHARD H. SEWELL, as Members of the Illinois Health Facilities and Services Review Board; THE DEPARTMENT OF PUBLIC HEALTH; LAMAR HASBROUCK, as Director of the Department of Public Health; THE SPRINGS AT CRYSTAL LAKE; FAIR OAKS HEALTH CARE CENTER; and CRYSTAL PINES REHABILITATION AND HEALTH CARE CENTER, Defendants (The Illinois Health Facilities and Services Review Board; Kathryn J. Olson, as Chair of the Illinois Health Facilities and Services Review Board; John Hayes, as Vice Chair of the Illinois Health Facilities and Services Review Board; Philip Bradley, James J. Burden, Deanna J. Demuzio, Dale Galassie, Alan Greiman, David Penn, and Richard H. Sewell, as Members of the Illinois Health Facilities and Services Review Board; The Springs at Crystal Lake; and Fair Oaks Health Care Center, Defendants-Appellants). |
| District & No. | Second District Docket Nos. 2-15-1214, 2-16-0057 cons. |
| Filed | November 3, 2016 |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 14-MR-569; the Hon. Michael T. Caldwell, Judge, presiding. |

| | |
|---|---|
| Judgment | Circuit court judgment reversed. |

| | |
|---|---|
| Counsel on Appeal | Mark J. Silberman and Nicholas J. Lynn, both of Duane Morris LLP, of Chicago, for appellants The Springs at Crystal Lake and Fair Oaks Health Care Center. |
| | Lisa Madigan, of Chicago (Carolyn E. Shapiro, Solicitor General, and Linda Boachi-Ansah, Assistant Attorney General, of counsel), for appellant Illinois Health Facilities & Services Review Board. |
| | Jason T. Lundy and Paula S. Kim, both of Polsinelli Shugart, P.C., of Chicago, for appellees. |

| | |
|---|---|
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion. Justices Jorgensen and Spence concurred in the judgment and opinion. |

## OPINION

¶ 1 Plaintiffs, ManorCare Health Services, LLC, HCR Healthcare, LLC, and HCR ManorCare, Inc. (collectively referred to as ManorCare), filed an application with defendant, the Illinois Health Facilities and Services Review Board (the Board), for a certificate of need to construct a new nursing home facility in Crystal Lake, Illinois. Three local nursing homes opposed the application: defendants The Springs at Crystal Lake (The Springs), Fair Oaks Health Care Center (Fair Oaks), and Crystal Pines Rehabilitation and Health Care Center (Crystal Pines). The Board denied the application, and ManorCare filed a complaint for administrative review in the circuit court of McHenry County, naming as additional defendants the Board's members and the Department of Public Health. The circuit court reversed the Board's decision and instructed the Board to issue a certificate of need. The Board and its members appeal, as do The Springs and Fair Oaks. For the reasons that follow, we reverse the circuit court's judgment and affirm the decision of the Board.

¶ 2 I. BACKGROUND

¶ 3 ManorCare hoped to construct a 130-bed, skilled-nursing facility on an 8.9-acre parcel at the intersection of Route 176 and Terra Cotta Road in Crystal Lake. To do so, it was required to apply for and receive a certificate of need from the Board. ManorCare emphasized in its April 24, 2012, application that the number of area residents over the age of 65 was expected to grow by 7.5% between 2011 and 2016. Additionally, the Board's bed-need formula showed a need for 469 additional skilled-nursing-facility beds in McHenry County by 2018. ManorCare also highlighted the lack of available private nursing home rooms in the county, a need that ManorCare intended to address with 50 private rooms. ManorCare further noted that, in the

United States, there are 43 licensed skilled-nursing-facility beds for every 1000 persons over the age of 65; the number of such beds within both a 5-mile and a 10-mile radius of ManorCare's proposed Crystal Lake facility was far below the national average. A 2010 McHenry County "Healthy Community" study also found that there was a lack of sufficient nursing home options in the county.

¶ 4    In its application, ManorCare declared that McHenry County residents were leaving the area for nursing-care services. In support of that conclusion, ManorCare noted that in 2010 2627 residents in the area received Medicare discharges to skilled-nursing facilities. If each of those patients required the average 30-day Medicare stay at a nursing facility, that would equal 78,810 patient days. However, the existing facilities in the area had provided only 68,944 days of Medicare services in 2010. Therefore, ManorCare posited, it was reasonable to assume that 9866 of the required 78,810 days of care had been provided outside of the county. Again assuming an average 30-day stay, ManorCare calculated that 328 patients had left McHenry County for nursing-care services. ManorCare asserted that it intended to bring those patients back to McHenry County.

¶ 5    On the other hand, ManorCare acknowledged in its application that data indicated that existing nursing homes in the area were being underutilized. According to the Board's regulations, the target utilization rate for long-term nursing-care services is an annual average occupancy of 90% of licensed beds. 77 Ill. Adm. Code 1125.210(c)-(d) (2011). In its application, ManorCare advanced possible reasons for the underutilization of existing facilities. For example, some facilities might have taken licensed beds out of service; it was also possible that families might have chosen not to use the existing facilities because of poor performance records.

¶ 6    The three existing nursing home facilities in Crystal Lake—The Springs, Crystal Pines, and Fair Oaks—each objected to ManorCare's application and argued that there was no need for the project. They noted that Crystal Pines was in the middle of a $500,000 renovation project. Fair Oaks was undergoing a $3.25 million renovation that included adding 16 private rooms. The Springs was a five-star facility that currently had over 30 beds available. The Springs had also recently received regulatory approval to expand its bed capacity.

¶ 7    Before the Board considers an application for a certificate of need, the Board's staff reviews the application and prepares a staff report. According to the staff report here, ManorCare's application, as originally submitted, complied with 16 of 20 review criteria. The initial application did not meet the "service demand" criterion, because ManorCare did not submit letters from hospitals and physicians projecting the number of patient referrals to the proposed facility. See 77 Ill. Adm. Code 1125.540 (2011). Additionally, the application did not meet the "service accessibility" criterion, *i.e.*, it did not show that "[t]he number of beds being established or added for each category of service is necessary to improve access for planning area residents." 77 Ill. Adm. Code 1125.570 (2011). To comply with this criterion, the applicant must document that at least one of the following factors exists in the planning area: (1) an absence of the proposed service; (2) access limitations due to the payor status of patients or residents; (3) existing providers' restrictive admission policies; (4) a medical-care problem in the area, such as an average family-income level that is below the poverty level or a designation of the area as a "Medically Underserved Area," a "Health Professional Shortage Area," or a "Medically Underserved Population"; or (5) all services within a 45-minute normal travel time meeting or exceeding the 90% occupancy standard. 77 Ill. Adm. Code 1125.570(a)

(2011). According to the staff report, there was no absence of the proposed service in the planning area. Nor were there access limitations, restrictive admission policies, or indicators of medical-care problems in the area. Additionally, 18 of the 26 facilities within 45 minutes of ManorCare's proposed location were not operating at target occupancy.

¶ 8 The staff report also noted that ManorCare's application did not meet the "unnecessary duplication/maldistribution" criterion. See 77 Ill. Adm. Code 1125.580 (2011). That criterion states:

> "(b) The applicant shall document that the project will not result in maldistribution of services. Maldistribution exists when the identified area (within the planning area) has an excess supply of facilities, beds and services characterized by such factors as, but not limited to:
>
> > (1) A ratio of beds to population that exceeds one and one-half times the State average;
> >
> > (2) Historical utilization (for the latest 12-month period prior to submission of the application) for existing facilities and services that is below the [90%] occupancy standard ***; or
> >
> > (3) Insufficient population to provide the volume or caseload necessary to utilize the services proposed by the project at or above occupancy standards." 77 Ill. Adm. Code 1125.580(b) (2011).

According to the staff report, 11 of the 17 facilities within 30 minutes of the proposed facility were not at target occupancy. Additionally, the average occupancy of those 17 facilities was only 81.38%, which indicated that there were approximately 161 long-term-care beds not being used in the 30-minute area.

¶ 9 Finally, due to the underutilization of existing facilities within both 30 and 45 minutes of the proposed facility, the staff report determined that ManorCare's application did not meet the "impact of project on other area providers" criterion. See 77 Ill. Adm. Code 1125.580(c) (2011). That criterion requires an applicant to document that, within 24 months after the completion of the proposed project, the project will not lower below 90% the utilization rates of other area providers and will not further lower the utilization rates of facilities that are currently operating below 90%. See 77 Ill. Adm. Code 1125.580(c) (2011).

¶ 10 The Board first considered ManorCare's application at its July 23, 2012, meeting. Board member James Burden asked a question regarding the projected need for 469 additional beds in McHenry County by 2018. A staff member for the Board explained that, pursuant to the relevant statute, bed need was calculated for 10-year periods. Accordingly, in 2008, the calculated need was for 469 additional beds by 2018. However, the staff member explained, the statute had recently been amended to provide that bed need would be calculated for five-year periods. The Board voted 7-1 against the project at the July 23 meeting. Burden indicated that his vote against the project was based on "several factors, not the least of which would be my concern for the projection of health needs at least six years in advance." He added, "I think we can address that in the future adequately." Other Board members stated that they voted against the project for the same reasons.

¶ 11 On July 25, 2012, the Board issued an intent-to-deny-letter, in response to which ManorCare could submit additional information and appear before the Board again. One of the arguments that ManorCare raised in its response was that its application had met more criteria

than any other skilled-nursing-facility application that the Board had approved in the past three years. The Board's staff subsequently drafted a supplemental report in which it determined that ManorCare had submitted sufficient referral information to meet the "service demand" criterion. However, the application still did not meet the "service accessibility," "unnecessary duplication/maldistribution," and "impact of project on other area providers" criteria. Specifically, based on new information that had been released since the original staff report was prepared, the supplemental report noted that, of the 26 existing facilities within 45 minutes of the proposed project, 20 were not operating at target occupancy and one was not yet operational. Additionally, 14 of the 17 facilities within 30 minutes of the proposed project were not at target occupancy, and their average occupancy was 79.48%. According to the amended staff report, Crystal Pines, Fair Oaks, and The Springs had utilization rates of 88.20%, 84.60%, and 64.40%, respectively.

¶ 12    The Board addressed ManorCare's application at a second meeting on December 10, 2012. Burden again addressed the 10-year projection of bed need, asking the Board staff: "Why do we continue to see projected occupancy data going up to 2018?" Burden continued: "How in the hell do we know? We can't tell sometimes two years how we're going to be." When a staff member explained that the bed-need projection was "our inventory estimate of how many beds are going to be needed in that Planning Area" by 2018, Burden responded: "that's the first time I've seen that lengthy of a bed-need methodology projected out that far, and I guess there's a reason for it that I'm missing." A representative of the Illinois Department of Public Health then explained to the Board that, although the applicable statute had recently been amended to require 5-year bed-need projections, it had been using 10-year projections for the past several years. The Board voted 5-3 to deny ManorCare's application. On December 17, 2012, the Board sent ManorCare a letter denying the certificate of need, based on noncompliance with the "service accessibility," "unnecessary duplication/maldistribution," and "impact on other area providers" criteria.

¶ 13    ManorCare exercised its right to a hearing before an administrative law judge (ALJ). The ALJ allowed The Springs, Crystal Pines, and Fair Oaks to intervene in the proceedings. The Board filed a motion *in limine*, seeking to bar ManorCare from introducing evidence relating to any projects other than the proposed ManorCare facility. In its response to the motion, ManorCare explained that it intended to introduce evidence showing that, from September 2008 through October 2012, the Board considered 26 other applications to establish new nursing homes and that, although each of those applications had negative findings with respect to the current utilization of existing providers in the planning area, the Board approved each application. ManorCare argued that this evidence demonstrated that "the Board grants new nursing home [certificate-of-need] applications despite non-conformance with 'current utilization' criteria." ManorCare also contended that this evidence showed that its application was in compliance with the Board's standards, criteria, and plans. The ALJ granted the motion *in limine* prohibiting ManorCare from introducing evidence relating to other projects.

¶ 14    Prior to and during the administrative hearing, there were lengthy discussions about ManorCare presenting an offer of proof with respect to the evidence that was excluded per the motion *in limine*. Much of the debate centered on whether the documents that ManorCare wanted to introduce had already been included in the record during prehearing motion practice. Although the ALJ purported to deny ManorCare's request to make an offer of proof, the record contains a 38-page, 177-paragraph written offer of proof submitted by ManorCare. (The

- 5 -

parties also supplemented the record in the trial court with the documents that ManorCare had hoped to introduce at the administrative hearing.)

¶ 15    Two witnesses testified at the administrative hearing. Donald Reppy, the director of health planning for HCR ManorCare, Inc., testified about the various reasons why ManorCare believed that there was a need for a new nursing home in Crystal Lake. Those reasons were consistent with what ManorCare had emphasized in its application (the projected need for 469 additional beds by 2018, the aging population, the lack of private rooms, the below-average number of beds per 1000 residents over the age of 65, the 2010 finding that there was a lack of nursing home options in the county, and ManorCare's conclusion that residents were leaving the county for nursing care). Reppy also explained that the 90% target utilization rate reflects past utilization, because it is based on information from previous years. Accordingly, an area might need nursing homes in the future even though existing facilities are operating below target utilization.

¶ 16    Michael Constantino, a senior project reviewer with the Department of Public Health, detailed the staff reports that were prepared in connection with ManorCare's application. When asked about the 161 unused nursing-care beds within 30 minutes of the proposed facility, he acknowledged that this number could be skewed by "dead beds," which are licensed beds that are not set up for use. Furthermore, Constantino acknowledged that the "service accessibility," "unnecessary duplication/maldistribution," and "impact on other area providers" criteria all deal with the utilization rates of existing facilities. However, utilization rate is a completely separate consideration from bed need. According to Constantino, no single factor, including bed need, is controlling.

¶ 17    At the conclusion of the administrative hearing, the ALJ submitted a report finding that ManorCare had failed to establish compliance with the "service accessibility," "unnecessary duplication/maldistribution," and "impact on other area providers" criteria. The ALJ recommended that the Board render a final administrative decision denying the application. On August 27, 2014, the Board accepted the ALJ's report and issued its final decision, denying ManorCare's application for a certificate of need.

¶ 18    ManorCare filed an action for administrative review in the trial court. On November 13, 2015, the trial court entered an order reversing the Board's decision and directing it to issue a certificate of need. The Springs, Crystal Pines, and Fair Oaks filed a notice of appeal, and the Board and its members subsequently filed a separate notice of appeal. This court consolidated the two appeals. Crystal Pines thereafter requested leave to withdraw as an appellant, and we granted the motion.

¶ 19                                            II. ANALYSIS

¶ 20    The appellants argue that the Board's decision to deny ManorCare's application was neither clearly erroneous nor arbitrary and capricious. They also argue that the ALJ acted within his discretion by prohibiting ManorCare from introducing evidence of unrelated projects.

¶ 21    We review the Board's final decision, not the trial court's order. *Mercy Crystal Lake Hospital & Medical Center v. Illinois Health Facilities & Services Review Board*, 2016 IL App (3d) 130947, ¶ 17. Reviewing the Board's ultimate decision to grant or deny a permit requires us to examine the legal effect of the facts, which presents a mixed issue of law and fact. *Mercy Crystal Lake Hospital*, 2016 IL App (3d) 130947, ¶ 17. Under the "clearly erroneous"

standard, we will not reverse unless the entire record leaves us " 'with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). Furthermore, an administrative decision may be overturned where it is arbitrary and capricious. *Marion Hospital Corp. v. Illinois Health Facilities Planning Board*, 324 Ill. App. 3d 451, 455 (2001). An administrative decision is arbitrary and capricious where the agency "(1) relies on factors which the legislature did not intend for the agency to consider; (2) entirely fails to consider an important aspect of the problem; or (3) offers an explanation for its decision which runs counter to the evidence before the agency, or which is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 505-06 (1988). "While an agency is not required to adhere to a certain policy or practice forever, sudden and unexplained changes have often been considered arbitrary." *Greer*, 122 Ill. 2d at 506. The "arbitrary and capricious" standard of review is the least demanding standard, the equivalent of the "abuse of discretion" standard. *Greer*, 122 Ill. 2d at 497.

¶ 22    In reviewing an application for a permit to construct a new nursing home facility, the Board must consider the numerous factors that are outlined in the administrative regulations. The Board has the discretion to approve an application even though the proposed project does not comply with all review criteria. See 77 Ill. Adm. Code 1130.660(a), amended at 30 Ill. Reg. 14852 (eff. Sept. 1, 2006). No single criterion is more important than any other (*Mercy Crystal Lake Hospital*, 2016 IL App (3d) 130947, ¶ 22), and the Board uses its judgment and expertise to consider and balance the applicable criteria (*Charter Medical of Cook County, Inc. v. HCA Health Services of Midwest, Inc.*, 185 Ill. App. 3d 983, 989 (1989)).

¶ 23    The Board ultimately determined that ManorCare's application did not meet the "service accessibility," "unnecessary duplication/maldistribution," and "impact on other area providers" criteria. At the hearing before the ALJ, ManorCare attempted to demonstrate why a certificate of need should be issued despite the fact that the application did not comply with all applicable criteria. Reppy, ManorCare's own witness, even acknowledged that the application did not meet multiple criteria and was not "entitled" to approval. ManorCare now changes its tune and argues that it complied with these three criteria, which it refers to collectively as the "Current Utilization criteria." In support of that position, ManorCare emphasizes that it presented evidence that the population of McHenry County was aging, that there was a lack of nursing home options and private rooms in the county, that the county had a below-average number of beds per 1000 seniors, and that calculations derived from Medicare data suggested that residents were leaving the county for nursing care. ManorCare also notes that "dead beds" could have affected the utilization rates of existing facilities in the area.

¶ 24    The Board's conclusion that ManorCare's application did not meet all applicable criteria was not clearly erroneous. Reppy acknowledged that the application did not meet all applicable criteria. Additionally, the Board detailed the number of existing facilities within 30 and 45 minutes of the proposed project that were operating below the target utilization rate. Although ManorCare introduced some evidence to support its position that there was a need for the proposed facility, it is not our role to reweigh the evidence. *Provena Health v. Illinois Health Facilities Planning Board*, 382 Ill. App. 3d 34, 47 (2008).

¶ 25    ManorCare further argues that the Board's decision was arbitrary and capricious because the Board rejected its own bed-need calculation. By statute, the Board is required to project

future bed need by planning area. When ManorCare filed its application, the statute called for 10-year projections. 20 ILCS 3960/12.5 (West 2010). Accordingly, the Board had projected in 2008 that McHenry County would need 469 additional beds by 2018. The statute was amended in August 2012 to require five-year projections. Pub. Act 97-1115 (eff. Aug. 27, 2012) (amending 20 ILCS 3960/12.5).

¶ 26 Emphasizing certain comments made by Board members at the meetings in July and December 2012, ManorCare proposes that the Board rejected its own bed-need determination. However, it is apparent that the Board was merely refusing to find that the 10-year bed-need projection was dispositive on the issue of whether there was a need for ManorCare's project. "The stated bed-need in a planning area is a projection; it does not create a fixed pool of beds or bind the Board." *Provena Health*, 382 Ill. App. 3d at 47. Although projected bed need is "a critical factor in determining need," the Board may "deny a proposed project if not needed even though there is a projected bed need." *Charter Medical*, 185 Ill. App. 3d at 988.

¶ 27 ManorCare offered numerous reasons why it believed that there was a need for another nursing home in Crystal Lake, even though competitors were operating below the target utilization rate. On the other hand, The Springs, Fair Oaks, and Crystal Pines vehemently opposed the application and insisted that there was no need for this particular project. In light of the conflicting evidence, the Board's assessment of need was not clearly erroneous, and the record does not support ManorCare's argument that the Board rejected its own bed-need determination. Moreover, we note that the comments that ManorCare highlights were made at the meetings when the Board initially considered the application; they were not part of the final administrative decision. We review the Board's final administrative decision denying the application. *Mercy Crystal Lake Hospital*, 2016 IL App (3d) 130947, ¶17; see 77 Ill. Adm. Code 1125.140 (2011) ("final administrative decision" means the action taken by the Board after an administrative hearing or the waiver of such hearing).

¶ 28 ManorCare also argues that the Board's decision was arbitrary and capricious because the Board had a practice of granting applications despite noncompliance with the "Current Utilization criteria." To that end, ManorCare wanted to introduce evidence showing that in the four years preceding its application—and again during the pendency of these proceedings—the Board had universally approved other projects that did not comply with those criteria. ManorCare notes that the regulations provide that the parties may present evidence and arguments that are "relevant to the question of consistency and conformity of the proposed project with the adopted standards, criteria or plans upon which the finding and decision of [the Board] was made." 77 Ill. Adm. Code 1130.1110(f), adopted at 30 Ill. Reg. 14852, 14971 (eff. Sept. 1, 2006). According to ManorCare: "Evidence regarding the Board's own practice of approving new nursing home [certificate-of-need] applications despite non-conformance with the Current Utilization criteria is clearly relevant to the question of the 'consistency and conformity' of the ManorCare project with the Board's standards, criteria, plans *and prior findings and decisions*." (Emphasis added.) Similarly, ManorCare contends that such evidence supports its theory that "non-conformance with Current Utilization criteria is no impediment to the Board's granting new nursing home applications, and that the Board's denial of ManorCare's application was an abrupt and irrational departure from past practice."

¶ 29 The ALJ granted the motion *in limine*, preventing ManorCare from introducing evidence along these lines. We review for an abuse of discretion an administrative agency's decisions

regarding the admission of evidence. *Wilson v. Department of Professional Regulation*, 344 Ill. App. 3d 897, 909 (2003).

¶ 30    We find no abuse of discretion. No two applications will ever be truly identical, and the decision whether to overlook noncompliance necessarily requires the Board to evaluate each project individually and as a whole. There are any number of circumstances that might influence the Board's decision to overlook noncompliance for one project but not another. For example, there might be a particular need for a specialized service within a given area. See *Marion Hospital Corp.*, 324 Ill. App. 3d at 457 (the Board's decision to overlook noncompliance with a review criterion was justified where no facility in that particular part of the state could have met all criteria so as to offer open-heart-surgery services). There are also varying degrees of compliance and noncompliance. An unopposed project in an unpopulated area of the state might not meet the "Current Utilization criteria" where the few existing facilities in the region operate at 89% capacity; another project in a more populated area might encounter numerous objecting competitors that are operating significantly below target capacity.

¶ 31    ManorCare contends that there is no indication in the record that the Board exercised its discretion in this fashion. According to ManorCare, instead of weighing the applicable criteria, the Board "rejected half the scale and only considered one side—Current Utilization." We disagree. The Board heard evidence both in favor of and against ManorCare's application. The Board ultimately denied the application and articulated its bases for doing so. As explained above, that decision was not clearly erroneous. ManorCare does not cite any authority that would require the Board to justify here its decisions to issue permits to other applicants.

¶ 32    Additionally, the regulations are clear about what evidence is relevant at an administrative hearing:

> "In a hearing to consider the denial of a permit ***, the applicant shall have the burden of establishing that the proposed project *** for which application for permit *** is made is consistent with the standards, criteria, or plans adopted by [the Board] upon which the finding and decision of [the Board] was made; only such testimony and evidence as is relevant shall be offered or accepted." 77 Ill. Adm. Code 1130.1110(e), adopted at 30 Ill. Reg. 14852, 14971 (eff. Sept. 1, 2006).

Section 1130.1110(f) similarly provides that "[a]ll parties to an administrative hearing shall have the right to give testimony, produce evidence, cross-examine adverse witnesses and present arguments relevant to the question of consistency and conformity of the proposed project with the adopted standards, criteria or plans upon which the finding and decision of [the Board] was made." 77 Ill. Adm. Code 1130.1110(f), adopted at 30 Ill. Reg. 14852, 14971 (eff. Sept. 1, 2006). Instead of showing that its application was consistent with the Board's standards, criteria, or plans, ManorCare wanted to show that noncompliance with such standards, criteria, or plans was "no impediment" to approval. Contrary to ManorCare's suggestion, section 1130.1110 does not mention a given project's consistency and conformity with the Board's "prior findings and decisions." The regulations specify the burden that ManorCare had to meet, and the proffered evidence was not relevant to meeting that burden.

¶ 33    Furthermore, if the ALJ had allowed ManorCare to introduce the proffered evidence, this court might now be reviewing dozens of unrelated projects to determine whether they were indeed comparable to ManorCare's proposal. The record reflects that defendants were prepared to dispute whether those projects were actually similar to ManorCare's proposed

project. However, none of this is relevant to the issue of whether ManorCare's proposal conformed to the Board's adopted standards, criteria, or plans.

¶ 34     We find support in *Caliendo v. Martin*, 250 Ill. App. 3d 409 (1993). In that case, two officers were discharged by a police board for accepting bribes during traffic stops. *Caliendo*, 250 Ill. App. 3d at 411. On appeal, the officers argued that the board's decision was arbitrary and unreasonable because, in unrelated cases, the board had suspended rather than discharged other officers who engaged in similar conduct. *Caliendo*, 250 Ill. App. 3d at 418. Although this evidence had not been presented to the police board, the court determined that the proffered evidence did not merit a remand to the board because the cited cases "did not involve the same surrounding circumstances." *Caliendo*, 250 Ill. App. 3d at 421. The court distinguished this from a prior case in which the police board had entered grossly disparate sanctions against two officers for violations arising out of the same incident. *Caliendo*, 250 Ill. App. 3d at 420. Like the officers in *Caliendo*, ManorCare wants to analogize its proposal to unrelated projects to show that the Board's action was arbitrary and capricious. We find that such evidence is irrelevant because the other projects do not involve the same circumstances.

¶ 35     ManorCare's reliance on *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 180 Ill. App. 3d 899 (1988), is misplaced. ManorCare cites *Commonwealth Edison* for the proposition that "an agency action that represents an abrupt departure from past practice is not entitled to the same degree of deference by a reviewing court." *Commonwealth Edison*, 180 Ill. App. 3d at 909. However, *Commonwealth Edison* bears no similarity to the matter at hand. In that case, Commonwealth Edison wanted to reduce the seasonal differential between its rates while maintaining revenue neutrality. *Commonwealth Edison*, 180 Ill. App. 3d at 901-02. After a two-year legal battle, the Illinois Commerce Commission (ICC) entered a rate schedule in April 1988; that schedule would achieve revenue neutrality within 12 months from the date of the decision rather than during the calendar year. *Commonwealth Edison*, 180 Ill. App. 3d at 902. After the appellate court stayed the April 1988 decision, Commonwealth Edison filed a petition to revise the schedule, on an expedited basis and without notice to interested parties. *Commonwealth Edison*, 180 Ill. App. 3d at 902-03. The ICC allowed the petition and entered an order in June 1988, setting a modified rate schedule that was based on a calendar year. *Commonwealth Edison*, 180 Ill. App. 3d at 903.

¶ 36     The appellate court reversed the June 1988 order, finding that the ICC's decision was arbitrary and capricious. *Commonwealth Edison*, 180 Ill. App. 3d at 906. Among the reasons was that, in previous published decisions dating back to 1979, the ICC had always used a 12-month revenue-neutralization period rather than a calendar-year period when setting Commonwealth Edison's rates. *Commonwealth Edison*, 180 Ill. App. 3d at 908. The ICC had even admitted in a brief that " '[i]t is a fundamental principle of utility regulation that rates are set by the [ICC] through use of a 12-month measuring period.' " *Commonwealth Edison*, 180 Ill. App. 3d at 908. Under these circumstances, the court concluded that the ICC had "radically altered its past practice regarding the time-frame for analyzing revenue neutrality without notice to interested parties, a hearing, or any readily apparent reason." *Commonwealth Edison*, 180 Ill. App. 3d at 909.

¶ 37     Unlike in *Commonwealth Edison*, the method the Board used to evaluate ManorCare's application was not different from the method it had applied in the past. Instead, because ManorCare's application did not comply with all applicable review criteria, the Board had the

discretion to grant or deny the permit. There is ample support in the record for the Board's decision to deny the permit.[1]

¶ 38 ManorCare also argues that the ALJ erred in refusing to allow it to present an offer of proof. However, the record on appeal contains ManorCare's detailed written offer of proof. The parties also supplemented the record in the trial court with the documents that ManorCare intended to introduce into evidence. The purpose of an offer of proof is "to preserve error in the exclusion of evidence by disclosing the nature of offered evidence to which an objection is successfully interposed." *Board of Education of Community Unit School District No. 337 v. Board of Education of Community Unit School District No. 338*, 269 Ill. App. 3d 1020, 1030-31 (1995). The record is clear as to what evidence ManorCare wanted to introduce and why it wanted to do so. Accordingly, any error by the ALJ in refusing to allow the offer of proof does not justify reversing the Board's decision.

¶ 39 Finally, ManorCare complains about the ALJ's statement that the application "does not meet all of the review criteria considered by the Board." ManorCare notes that the regulations indicate that "[t]he failure of a project to meet one or more review criteria *** shall not prohibit the issuance of a permit." 77 Ill. Adm. Code 1130.660(a), amended at 30 Ill. Reg. 14852, 14936 (eff. Sept. 1, 2006). We find no error in the ALJ's statement. As explained above, the Board's finding that ManorCare did not meet three of the review criteria was not clearly erroneous. Moreover, it is clear that the ALJ understood that the Board had discretion to approve the project despite noncompliance with all of the criteria. Indeed, the ALJ specifically acknowledged that "[t]he Board had discretion to approve Respondent's application, despite non-compliance with all review criteria, but the Board did not determine that Respondent's factors outweighed non-compliance with the Board's criteria."

¶ 40                                  III. CONCLUSION

¶ 41 For the reasons stated, we reverse the judgment of the circuit court of McHenry County and affirm the decision of the Illinois Health Facilities and Services Review Board.

¶ 42 Circuit court judgment reversed.

---

[1]Having determined that the proffered evidence was irrelevant, there is no need to address the parties' dispute as to whether ManorCare was attempting to engage in "comparative review."