# Illinois Official Reports

## Appellate Court

---

### *Centegra Hospital-McHenry v. Mercy Crystal Lake Hospital & Medical Center, Inc.*, 2019 IL App (2d) 180731

---

| | |
|---|---|
| Appellate Court Caption | CENTEGRA HOSPITAL-McHENRY, CENTEGRA HOSPITAL-HUNTLEY, CENTEGRA HOSPITAL-WOODSTOCK, and CENTEGRA HEALTH SYSTEM, Plaintiffs-Appellees, v. MERCY CRYSTAL LAKE HOSPITAL AND MEDICAL CENTER, INC.; MERCY HEALTH CORPORATION; MERCY HEALTH SYSTEM CORPORATION; and THE ILLINOIS HEALTH FACILITIES AND SERVICES REVIEW BOARD, Defendants-Appellants (Advocate Health and Hospitals Corporation, d/b/a Advocate Good Shepherd Hospital and Advocate Sherman Hospital, Intervenor-Appellee). |
| District & No. | Second District<br>Nos. 2-18-0731, 2-18-0742 cons. |
| Filed | November 22, 2019 |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 17-MR-564; the Hon. Thomas A. Meyer, Judge, presiding. |
| Judgment | Circuit court judgment reversed.<br>Board decision affirmed. |
| Counsel on Appeal | J. Timothy Eaton, Jonathan B. Amarilio, and Paul J. Coogan, of Taft Stettinius & Hollister LLP, and Mark J. Silberman, of Benesch Law, both of Chicago, for appellants Mercy Crystal Lake Hospital & Medical Center, Inc., Mercy Health Corporation, and Mercy Health System Corporation. |

Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Richard S. Huszagh, Assistant Attorney General, of counsel), for appellant Illinois Health Facilities and Services Review Board.

Daniel J. Lawler and Daniel P. Albers, of Barnes & Thornburg LLP, of Chicago, and Thomas C. Zanck and James L. Wright, of Zanck, Coen, Wright & Saladin, PC, of Crystal Lake, for appellees Centegra Hospital-McHenry, Centegra Hospital-Huntley, Centegra Hospital-Woodstock, and Centegra Health System.

Hal R. Morris, Joe Ourth, and Elizabeth A. Thompson, of Saul Ewing Arnstein & Lehr LLP, of Chicago, for intervenor-appellee.

| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion. |
|---|---|
| | Justices Hutchinson and Burke concurred in the judgment and opinion. |

## OPINION

¶ 1    The defendants Mercy Crystal Lake Hospital and Medical Center, Inc., Mercy Health Corporation, and Mercy Health System Corporation (collectively referred to as Mercy) filed an application with the defendant the Illinois Health Facilities and Services Review Board (Board) for a certificate of need to construct a new hospital in Crystal Lake. Two competing hospital systems opposed the application: (1) the plaintiffs, Centegra Hospital-McHenry, Centegra Hospital-Huntley, Centegra Hospital-Woodstock, and Centegra Health System (collectively referred to as Centegra) and (2) the intervenor, Advocate Health and Hospitals Corporation, doing business as Advocate Good Shepherd Hospital and Advocate Sherman Hospital (collectively referred to as Advocate). The Board granted the application. Centegra filed a complaint for administrative review in the circuit court of McHenry County, which reversed the Board's decision. Mercy and the Board appeal from that order. We reverse the circuit court's judgment and affirm the Board's decision.

¶ 2                                                    BACKGROUND

¶ 3    The Illinois Health Facilities Planning Act (Planning Act) (20 ILCS 3960/1 *et seq.* (West 2016)) requires regulatory approval before any health care facility may be constructed or modified in Illinois. The purpose of the Planning Act is to "assess the financial burden to patients caused by unnecessary health care construction and modification" of health care facilities. *Id.* § 2. The Planning Act provides for the creation of the Board and governs its duties and functions. *Id.* § 4. Under the Planning Act, no person may construct, modify, or establish a health care facility without first obtaining a permit or exemption from the Board. *Id.* § 5. The

Illinois Department of Public Health (Department) serves as administrative and staff support for the Board. *Id.* § 4. The Department is authorized, with the prior approval of the Board, to prescribe rules, regulations, standards, and procedures to carry out the provisions and purposes of the Planning Act. *Id.* § 12. The regulations are contained in parts 1100 through 1270 of Title 77 of the Illinois Administrative Code. 77 Ill. Adm. Code 1100 through 1270.

¶ 4        Mercy hoped to construct what it described as a "micro-hospital" in Crystal Lake. To do so, it was required to apply for and receive a certificate of need from the Board. In its January 25, 2017, application, Mercy stated that the proposed hospital would have 11 medical/surgical beds and two intensive care unit (ICU) beds. It would also have a seven-station emergency room, surgery rooms, diagnostic imaging, a pathology laboratory, a pharmacy, and other support services. The proposed hospital would be 111,346 square feet and cost about $81 million to construct. The record indicates that Mercy also filed an application for an adjacent medical office building (MOB), which would be connected to the proposed hospital. The application for the MOB was approved and is not part of this appeal.

¶ 5        In its application for the hospital, Mercy acknowledged that there was an excess of 43 medical/surgical beds and 3 ICU beds in the relevant planning area in McHenry County. The planning area is defined by the zip codes that are fully or partly within a 30-minute travel time of the proposed hospital. Mercy stated that it would reduce the number of surgical and ICU beds at its Harvard hospital by an amount equivalent to the beds created at the proposed hospital to ensure that the bed capacity in the relevant planning area would not increase. Mercy stated that the proposed hospital would provide enhanced and more affordable health care choices. It would also provide better access to critical health care services for Medicaid subscribers, charity care patients, and elderly residents in Crystal Lake, all of whom now had to find transportation to other communities for these services. Mercy acknowledged that the proposed facility did not meet the 100-bed requirement (see 77 Ill. Adm. Code 1110.530(g), amended at 38 Ill. Reg. 8861, 8903 (eff. Apr. 15, 2014)), but it stated that the size "will best meet the actual needs of the planning area."

¶ 6        On February 21, 2017, the Board held a public hearing to solicit community input. According to the Board's public hearing report, 90 people registered appearances, and of those, 79 supported the proposal and 11 opposed it. Of the 68 people who provided oral comments, 46 were in favor and 22 opposed. Overall, 125 of 158 registered attendees supported the project. At the hearing, Javon Bea, Mercy's president and CEO, acknowledged that the proposal was the first in Illinois for a "micro hospital" but that Mercy had "significant experience in successfully and profitably operating small-size hospitals with integrated outpatient medical clinics appropriately scaled to meet the community['s] needs."

¶ 7        Another Mercy representative, Tracey Klein, testified that the proposed hospital would bring needed care to vulnerable populations, such as the elderly and chronically ill. The project was an effort "to put the right care at the right time in an accessible location." She noted that Mercy provided services for 30,000 patients in McHenry County. The proposed hospital would provide managed and coordinated care and emergency services close to home. Dr. Jason Bredenkamp, a board-certified emergency physician, submitted written comments discussing the increasing use of emergency departments and the importance of having an emergency room close to home for patients in Crystal Lake. He stated that the majority of emergency room patients provided their own transportation and that most of those patients could not travel long distances to reach an emergency room.

¶ 8 Also at the hearing, Dave Nelson, the Harvard city administrator, stated that he supported Mercy's application and that he had enjoyed working with Mercy in Harvard. Harvard had excess bed capacity, and he believed that a redistribution of beds was sensible. He stated that Mercy was always fully committed to any community where it provided its services. Harvard Mayor Michael Kelly also expressed his support for the project. He stated that Mercy was a valuable partner to the Harvard community. The Mercy facility in Harvard fostered economic growth and provided many well-paying jobs in the community. He believed that redistributing beds from Harvard to Crystal Lake, a community that lacked health care services, was a responsible and efficient use of resources. He stated that Mercy was committed to bringing health care services close to home, serving the needs of the less fortunate, and helping to improve the economy.

¶ 9 Jack Franks, the chair of the McHenry County Board, sent a letter that was read at the hearing. In that letter, Franks stated that the proposal was good for the community and the economy, noting that it would create jobs, reduce health care costs for those in the community, increase access to services for "disadvantaged patients who find it difficult to travel," and, for the first time, create a local emergency department. Local citizens expressed concern about the current long distance that must be traveled to reach an emergency room. One citizen noted that it was "very time consuming and inconvenient" to have to travel to Woodstock for necessary medical services.

¶ 10 Comments in opposition to the proposed facility attacked the proposed cost, asserted that a small hospital could not provide the same level of care as a full-size hospital, and noted the bed surplus in the planning area and the proposed facility's failure to meet the 100-bed criterion. A physician employed by Advocate expressed concern that the facility would dilute volume for the existing hospitals and immediate care centers. Advocate's vice president of finance testified that the budget was unreasonable. Centegra representatives also opposed Mercy's application, because the facility would hurt their business.

¶ 11 Before the Board considers an application for a certificate of need, the Department, as the Board's staff, reviews the application and prepares a report. In the report here, the staff made the following relevant findings. There was an excess of medical and surgical beds in the applicable planning area, but Mercy was committed to decreasing beds at its Harvard hospital such that there would be no overall increase should the proposal be approved. The population to be served by the proposed facility was currently receiving care at underutilized facilities in the planning area. An unnecessary duplication of services could result if the proposal were approved. Mercy met all of the Board's standards regarding the size and cost components of the project, but the staff was still concerned about the large cost of the project.

¶ 12 According to the staff report, the application complied with 16 of the 22 review criteria. The report noted that the application did not meet the "performance requirements" criterion of 100 medical/surgical beds and 4 ICU beds. See *id.* It also did not meet 1 of the 12 "projected utilization" criteria, because Mercy did not provide documentation that the two ICU beds would be at the target occupancy of 60% within two years. See 77 Ill. Adm. Code 1110.234(b), amended at 34 Ill. Reg. 6121, 6134 (eff. Apr. 13, 2010). Additionally, the application did not meet the "planning area need" criterion, because there was already an excess of medical and surgical beds in the planning area and only one of the eight hospitals in the planning area was at target occupancy for medical/surgical and ICU beds. See 77 Ill. Adm. Code 1110.530(c)(1), (2), (3), (5), amended at 38 Ill. Reg. 8861, 8894-8901 (eff. Apr. 15, 2014). It also did not meet

certain criteria related to unnecessary duplication and impact on other providers. See *id.* §§ 1110.530(d); 1110.3030(c)(3). Finally, it did not meet two criteria related to assurances that the project would be at target occupancy and utilization rates after the second year of operation. 77 Ill. Adm. Code 1110.234(e), amended at 34 Ill. Reg. 6121, 6136 (eff. Apr. 13, 2010); 77 Ill. Adm. Code 1110.530(h), amended at 38 Ill. Reg. 8861, 8903-04 (eff. Apr. 15, 2014).

¶ 13    The staff report found that the project conformed to review criteria related to availability of funds, financial viability, reasonableness of financing arrangements, terms of debt financing, reasonableness of project costs, purpose of the project, size of the project, and staffing availability. See 77 Ill. Adm. Code 1110.234(a), amended at 34 Ill. Reg. 6121, 6133-34 (eff. Apr. 13, 2010); 77 Ill. Adm. Code 1110.530(f), amended at 38 Ill. Reg. 8861, 8903 (eff. Apr. 15, 2014); 77 Ill. Adm. Code 1120.120, 1120.130, 1120.140 (2016). The report also indicated that Mercy met the criterion that required it to be fit, willing, and able and to have the qualifications, background, and character to adequately provide a proper standard of health care service for the community. See *id.* § 1110.110(a)(1).

¶ 14    The Board considered Mercy's application at a hearing on June 20, 2017. At the hearing, Mercy addressed the review criteria and responded to the Board's questions. Many of the questions related to the failure to meet the minimum-bed criterion and the effect the project would have on facility utilization in the area. A Mercy representative, Ralph Weber, stated that the 100-bed criterion was created over 35 years ago, when the length of hospital stays was much longer. Since then, there had been a drastic shift to outpatient care, resulting in less need for beds. Weber explained that the proposed hospital was sized to fit the community's needs. He stated that the majority of Illinois hospitals had under 100 beds and that over 30% of hospitals had a daily census of 10 patients or fewer. He noted that, as stated in the application, the forecasted average daily census in the proposed hospital was 10 patients—which was similar to many hospitals throughout Illinois and represented a 91% occupancy rate. He also stated that the impact on other area providers would be minimal and outweighed by the benefit to Crystal Lake residents, who could receive coordinated care within one system at one location.

¶ 15    Bea also testified on the merits of the project. He testified that Mercy based its model on the Mayo Clinic model, in which inpatient and outpatient care were integrated, doctors and hospitals were contiguous, and there was only one medical record for each patient. This model resulted in better quality care at a lower cost. Bea noted that 65% of people left McHenry County for health care, while the average in other counties was less than 10%. He noted that a doctor from Purdue opined that the biggest barrier to health care for Crystal Lake residents was transportation and getting to an emergency room in another city. Bea stated that an emergency room needed some short-stay beds to stabilize patients overnight if necessary. Also, some outpatient surgeries might require overnight stabilization for patients who are elderly or otherwise weak.

¶ 16    Bea further testified that the purpose of the small hospital, and mainly the emergency room, was to assist the over 7500 patients in Crystal Lake who were on Medicaid and charity and had tremendous barriers to receiving care. He stated that Mercy had successfully and profitably operated similar small hospitals in Harvard and Lake Geneva, Wisconsin. If the project were approved, patients in Crystal Lake would get the benefits of a multispecialty clinic, which he referred to as "one-stop shopping." He noted, for example, that an elderly patient could see a primary care doctor and a specialist, get tests, have procedures, and be stabilized overnight if

necessary, all in one location. Bea explained that the competitive impact on other hospitals in the area would be less than 2% in terms of admissions.

¶ 17    John Hanley, a health care investment banking specialist, testified that micro-hospitals could be financially viable. Viability was related to the hospital's management and ability to provide appropriate care to the patient population that it served. He stated that Mercy enjoyed a strong rating by Moody's Investors Service and Fitch Ratings. Michael Hill, the public health administrator for McHenry County, supported the application. He noted that more than 65% of McHenry County residents sought medical care outside McHenry County. Mercy's proposed hospital would bring vital new resources to the community that would improve access to care, especially for the elderly and indigent who could not afford reliable transportation. At-risk populations in Crystal Lake suffered from the lack of a local emergency room, contributing to poor health and skyrocketing health care costs. Hill believed that the proposed hospital would increase efficiency, reduce costs, and provide better care for the growing community of Crystal Lake.

¶ 18    There was also testimony from those who opposed the application. Hadley Streng, a senior vice president of strategy and development for Centegra, testified that micro-hospitals normally have 8 to 10 beds, cost between $7 and $30 million, and are 15,000 to 50,000 square feet. Mercy's proposed hospital would include 13 beds, cost about $80 million, and be 111,000 square feet. Streng opined that there was no service gap, as there were five hospitals within 12.5 miles of the proposed hospital. Aaron Shepley, general counsel for Centegra, testified that he was the mayor of Crystal Lake. He opposed Mercy's application. He testified that a micro-hospital was a new idea that had never been approved or constructed in Illinois and was not permitted under the Planning Act. He noted that the micro-hospital would be the bottom two floors of the proposed facility and that the top two floors would be the MOB. He believed that this was a ploy so that Mercy could incrementally convert the office building to hospital space without further approval from the Board.

¶ 19    Following the hearing, the Board voted on the application. The final vote was 6 to 1 in favor of the project. Member Brad Burzynski said he reviewed the staff report and recommendations. He stated that there were valid issues that needed to be addressed in the future, such as the required 100-bed minimum. He concluded by stating that he had concerns about the size of the hospital but that, "looking at all the information *** provided," he would vote in favor. Member Deanna Demuzio stated that she was voting in favor because Mercy had responded to the staff's findings and Mercy was in good financial shape. Member Joel Johnson stated that he was voting in favor because Mercy had responded to many of the issues raised in the staff report. He also noted that perhaps the regulations needed to be reviewed to determine if they met current health care needs. Member John McGlasson voted in favor "based on the testimony regarding the ability to, hopefully, lower costs in health care." Member Marianne Eterno Murphy stated that she would vote yes "[b]ased on the findings in the report that were positive and based on [Mercy's] response to the negative findings and especially the comments from the community in favor." Chairwoman Kathy Olson stated that she was voting in favor because the project would not change the number of beds in the planning area, the project would not have a negative impact on the larger providers, emergency department access was necessary, Mercy served many Medicaid and charity care patients, and individuals in the area deserved local access to health care. Vice Chairman Richard Sewell stated that he was

voting against the application because "the way this process works is that we change the rules and then we apply them to prospective applications."

¶ 20    On June 22, 2017, the Board issued a letter formally approving the project. In that letter, the Board stated that the "approval was based upon the substantial conformance with the applicable standards and criteria in the *** Planning Act (20 ILCS 3960) and 77 Illinois Administrative Codes 1110 and 1120." The Board noted that it adopted the staff's report and findings and that it had considered the application, public hearing testimony, public comments and documents, and testimony presented before the Board.

¶ 21    Centegra filed a complaint for administrative review, arguing that the Board's decision was against the manifest weight of the evidence and was arbitrary and capricious. Advocate intervened and raised similar arguments. After briefing by the parties, the trial court reversed the Board's decision. The trial court found that the Board's approval of Mercy's application was arbitrary and capricious "due to the complete absence of evidence or explanation to support the Board's reasons for disregarding 77 Ill. Adm. Code 1110.530(1)(3), which explicitly requires a hospital *** to have a minimum of 100 beds." The trial court acknowledged that, under the Illinois Administrative Code, the failure to meet one or more of the review criteria did not prohibit the approval of an application. However, the trial court found that, because the 10-bed hospital would be such a radical departure from the 100-bed minimum, the Board was required to explain or provide some evidence to explain why such a departure was acceptable. The trial court also noted that some Board members made comments indicating that the 100-bed minimum was outdated. The trial court found that such statements indicated that the members relied on factors that the legislature did not intend them to consider, namely, future changes in the bed-requirement criterion.

¶ 22    Mercy and the Board filed motions to reconsider and also requested in the alternative that the matter be remanded to the Board for further explanation of its decision. The trial court denied the motions to reconsider and the request for a remand to the Board. Mercy and the Board both filed timely notices of appeal. We consolidated those appeals.

¶ 23                                   ANALYSIS

¶ 24    Mercy and the Board argue that the trial court erred in reversing the Board's decision to grant the certificate of need. They argue that the Board's decision was neither clearly erroneous nor arbitrary and capricious.

¶ 25    We review the Board's decision, not the trial court's order. *ManorCare Health Services, LLC v. Illinois Health Facilities & Services Review Board*, 2016 IL App (2d) 151214, ¶ 21. The Board is to approve and authorize the issuance of a permit if it finds

>   "(1) [that] the applicant is fit, willing, and able to provide a proper standard of health care service for the community ***, (2) that economic feasibility is demonstrated ***, (3) that safeguards are provided which assure that the establishment, construction or modification of the health care facility *** is consistent with the public interest, and (4) that the proposed project is consistent with the orderly and economic development of such facilities and equipment and is in accord with standards, criteria, or plans of need adopted and approved pursuant to the provisions of Section 12 of this Act." 20 ILCS 3960/6(d) (West 2016).

¶ 26    On review, an administrative agency's factual findings are considered to be *prima facie* true and correct, and the reviewing court will not disturb those findings unless they are contrary to the manifest weight of the evidence. *Mercy Crystal Lake Hospital & Medical Center v. Illinois Health Facilities & Service Review Board*, 2016 IL App (3d) 130947, ¶ 17. However, the ultimate decision of the administrative agency presents a mixed question of law and fact. *Id.* A mixed question of law and fact "involves an examination of the legal effect of a given set of facts." *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). Accordingly, we apply the "clearly erroneous" standard of review. *Id.* "The clearly erroneous standard of review is significantly deferential, and, so long as the record contains evidence supporting the agency's decision, it should be affirmed." *Mercy Crystal Lake*, 2016 IL App (3d) 130947, ¶ 17. The agency's decision should be reversed only where there is evidence supporting reversal and the court is left with a definite and firm conviction that a mistake has been committed. *Provena Health v. Illinois Health Facilities Planning Board*, 382 Ill. App. 3d 34, 39 (2008).

¶ 27    An administrative decision may also be overturned if it is arbitrary and capricious. *ManorCare*, 2016 IL App (2d) 151214, ¶ 21. An administrative decision is arbitrary and capricious where the agency "(1) relies on factors which the legislature did not intend for the agency to consider; (2) entirely fails to consider an important aspect of the problem; or (3) offers an explanation for its decision which runs counter to the evidence before the agency, or which is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 505-06 (1988). Sudden and unexplained changes to policies or practices have often been considered arbitrary. *Id.* at 506. The "arbitrary and capricious" standard of review is the least demanding standard, the equivalent of the "abuse of discretion" standard. *Id.* at 496-97.

¶ 28    In reviewing an application, the Board must consider numerous factors that are outlined in the administrative regulations. The Board has discretion to approve an application even if the proposed project does not comply with all review criteria. See 77 Ill. Adm. Code 1130.660(a) (2016). This is true even if the criteria contain mandatory language. *Provena Health*, 382 Ill. App. 3d at 42. No single criterion is more important than any other. *ManorCare*, 2016 IL App (2d) 151214, ¶ 22. The Board is responsible for using its judgment and expertise to consider and balance the applicable criteria. *Id.* The Board must evaluate each project as a whole, rather than focus on any one criterion. *Id.* ¶ 30. "There are any number of circumstances that might influence the Board's decision to overlook noncompliance" in one circumstance but not another. *Id.*

¶ 29    In the present case, we cannot say that the Board's decision was clearly erroneous. A public hearing was held at which 46 people spoke in favor of the application and 22 spoke in opposition. Of the 90 people registered, 79 supported the proposal, and 11 opposed it. Nelson and Kelly both favored the application, and many local citizens spoke in favor of having an emergency room available in Crystal Lake. While the staff report found that the application did not meet six review criteria, the report also found that it did meet the majority of the review criteria. The staff report stated that the application did not meet the criteria requiring 100 hospital beds and 4 ICU beds. However, Mercy representatives addressed the purpose of the small hospital and explained why the departure from those requirements made the project better able to meet the needs of the community.

¶ 30     Further, there was evidence to support the four statutory requirements for the issuance of the permit. See 20 ILCS 3960/6(d) (West 2016). As to the first statutory requirement, there was evidence that Mercy was willing and able to provide a proper standard of health care to Crystal Lake. The staff report concluded that Mercy met this requirement, and Bea testified to Mercy's successful record of providing quality health care in nearby communities. The second statutory requirement is that the project be economically feasible. The staff report concluded that the project conformed to all the economic review criteria. Specifically, the staff report indicated that Mercy had sufficient resources to fund the project, Mercy had a good bond rating, the cost of the project was reasonable, and the projected operating costs were within the Board's standards.

¶ 31     The third requirement is that the project be consistent with the public interest. There was testimony from public officials who supported the project and believed that it would provide necessary services to the residents of Crystal Lake. The majority of the registered attendees at the public hearing supported the project. There was also evidence of the need for an emergency department in Crystal Lake and the advantage of receiving coordinated care close to home. The fourth and final requirement is that the project be consistent with the orderly and economic development of health care facilities and in accord with the applicable standards and criteria. *Id.* As noted, the staff report determined that the project met 16 of the 22 review criteria. The Board has discretion to grant or deny a permit if it does not comply with all the review criteria. *ManorCare*, 2016 IL App (2d) 151214, ¶ 22. Even though the application did not meet six of the review criteria, there was evidence of public support for the project and testimony that it would serve a specific need in the community. As such, there was sufficient evidence to support the Board's determination, and we are not left with a definite and firm conviction that a mistake was committed.

¶ 32     Advocate and Centegra argue that the Board's determination was arbitrary and capricious because the Board either ignored the bed-requirement criterion or improperly amended its own rules. However, the Board did not fail to consider the bed-requirement criterion. There is a distinction between completely disregarding an applicable review criterion and addressing the failure to meet the criterion and giving a valid basis for such failure. Here, Mercy acknowledged that its application did not satisfy the bed-requirement criterion, and the issue was addressed in the staff report and discussed at the hearing before the Board. At the hearing, Board members questioned Mercy representatives, who explained why the proposal's deviation from the bed requirement would better enable it to meet the needs of the community, lower health care costs, and provide better care for the poor and elderly in Crystal Lake. Further, the statements the Board members made when voting to approve the application indicate that they had considered the negative review criteria. As such, the argument that the bed-requirement criterion was simply ignored is without merit.

¶ 33     Moreover, the Board's rules provide that the failure to meet one or more of the applicable review criteria does not preclude the Board from granting an application. 77 Ill. Adm. Code 1130.660(a) (2016). Illinois courts have repeatedly given effect to this provision. See *Mercy Crystal Lake*, 2016 IL App (3d) 130947, ¶ 22 (approval with three negative criteria not clearly erroneous); *Provena Health*, 382 Ill. App. 3d at 42-43 (approval with seven negative criteria not clearly erroneous); *Marion Hospital Corp. v. Illinois Health Facilities Planning Board*, 324 Ill. App. 3d 451, 454-57 (2001) (failure to meet all review criteria did not preclude approval of application). The Board heard evidence both in favor of and against Mercy's

application. The Board merely determined that the need for the project outweighed noncompliance with some of the review criteria.

¶ 34 The record also refutes any suggestion that the Board improperly amended its own rules. We acknowledge that one of the Board members commented that the Board might want to consider revisiting the bed-requirement criterion. However, this is not evidence that the Board relied on factors that the legislature did not intend for it to consider. The comment actually demonstrates that the Board did consider the bed-requirement criterion and was aware that there were requirements for changing the criterion. Thus, as noted, the record shows that the Board considered the bed-requirement criterion and the positive and negative staff findings. It also considered Mercy's justifications and explanations for failing to meet the criterion and considered the objections of Mercy's competitors. It was within the Board's discretion to approve Mercy's application despite the failure to meet all the review criteria. 77 Ill. Adm. Code 1130.660(a) (2016).

¶ 35 Advocate argues that the bed-requirement criterion was a "performance" criterion, not a "review" criterion, and was therefore not within the purview of section 1130.660(a). Thus, it argues, the Board was precluded from approving the project. First, Advocate fails to cite any authority to support the proposition that a "performance" criterion is somehow different from a "review" criterion. Further, section 1110.10(a) of the Board's regulations states:

> "[t]he applicant is responsible for addressing all pertinent review criteria that relate to the scope of a construction or modification project or to a project for the acquisition of major medical equipment. Applicable review criteria may include, but are not limited to, general review criteria, discontinuation, *category of service criteria*, and financial and economic feasibility criteria." (Emphasis added.) 77 Ill. Adm. Code 1110.10, amended at 38 Ill. Reg. 8861, 8875-76 (eff. Apr. 15, 2014).

Section 1110.530, addressing the minimum bed requirement, is contained in subpart F of the Code, which is titled "Category of Service Review Criteria." When Mercy filed its application, section 1110.530 was titled "Medical/Surgical, Obstetric, Pediatric and Intensive Care—Review Criteria." Further, a chart in section 1110.530 sets forth the relevant review criteria for different project categories, including for the establishment of a new facility. Section 1110.530(g), "Performance Requirements," is among the required "review criteria." Accordingly, we reject Advocate's argument that the performance requirements are excluded from the review criteria subject to section 1130.660(a).

¶ 36 Advocate also argues that the Board was precluded from approving Mercy's application, because the bed-requirement criterion was mandatory. At the time of Mercy's application, section 1110.530(g) provided that the "minimum bed capacity *** is 100 beds." 77 Ill. Adm. Code 1110.530(g), amended at 38 Ill. Reg. 8861, 8903 (eff. Apr. 15, 2014)). Advocate argues that this language was mandatory and thus precluded approval of the application. Such an argument was rejected in *Provena Health*, where the court stated:

> "The majority of courts have held section 1130.660 allows the Board to issue a permit even though a proposed project fails to meet all the applicable review criteria. This is true even where the applicant fails to comply with a criterion containing 'mandatory' language." *Provena Health*, 382 Ill. App. 3d at 42.

Advocate has failed to provide any compelling reason to depart from this precedent, and we decline to do so.

¶ 37    Advocate further argues that the Board's decision was arbitrary and capricious because there is no other case where an application was granted with such a significant departure from the review criteria. In addressing this contention, this court's decision in *ManorCare* is instructive. In that case, ManorCare's application was denied, and ManorCare exercised its right to a hearing before an administrative law judge (ALJ). *ManorCare*, 2016 IL App (2d) 151214, ¶ 13. ManorCare argued that the Board's decision was arbitrary and capricious because the Board had a practice of granting applications despite noncompliance with, specifically, the current utilization criteria. *Id.* ¶ 28. ManorCare wanted to introduce evidence of prior findings and decisions of the Board, but the ALJ did not allow it to introduce such evidence. *Id.* ¶ 29. On review, we found that the ALJ did not abuse his or her discretion. *Id.* ¶ 30. We stated:

> "No two applications will ever be truly identical, and the decision whether to overlook noncompliance necessarily requires the Board to evaluate each project individually and as a whole. There are any number of circumstances that might influence the Board's decision to overlook noncompliance for one project but not another. For example, there might be a particular need for a specialized service within a given area. [Citation.] There are also varying degrees of compliance and noncompliance." *Id.*

We noted that evidence of the Board's decisions in unrelated cases was not relevant to the issue of whether ManorCare's application conformed to the Board's standards or criteria, because other projects did not involve the same circumstances. *Id.* ¶¶ 33-34. Further, distinguishing a case in which a regulatory agency had "radically altered its past practice," we concluded that "the method the Board used to evaluate ManorCare's application was not different from the method it had applied in the past" and that the Board had continued to apply its discretion over whether to grant an "application [that] did not comply with all applicable review criteria." (Internal quotation marks omitted.) *Id.* ¶¶ 36-37.

¶ 38    In this case, as in *ManorCare*, whether the Board ever issued a permit with the same degree of noncompliance with the bed-requirement criterion is not relevant, because the Board is required to evaluate each project on its own merit and other projects do not involve the same circumstances. *Id.* ¶¶ 30, 34. The fact that no other application has ever been approved with such a significant variance from the bed-requirement criterion does not mean that the Board ignored the criterion entirely or acted arbitrarily and capriciously. Rather, as in *ManorCare*, the Board used the same method it had always used to evaluate applications and continued to apply its discretion over whether to grant an application that did not satisfy all the review criteria. As noted above, the Board heard evidence both in favor of and against Mercy's application, and it determined that the failure to meet the bed-requirement criterion was not dispositive on the issue of whether there was a need for Mercy's project. See *id.* ¶ 26.

¶ 39    Advocate argues that the Board's determination was legally insufficient because the Board failed to provide any meaningful rationale for its decision. This argument is also without merit. The Planning Act provides that, if the Board denies a permit application, "the Board shall include in the final decision a detailed explanation as to why the application was denied." 20 ILCS 3960/12(11) (West 2016); see *Access Center for Health, Ltd. v. Health Facilities Planning Board*, 283 Ill. App. 3d 227, 237 (1996) (Board required to specify findings and conclusions only when it denies an application). However, the Planning Act does not have a similar requirement if the Board approves an application, as it did in the present case.

¶ 40    Rather, the Planning Act provides that, if the Board approves an application, it is required only to "[p]rovide its rationale when voting on an item" (20 ILCS 3960/12(10.5) (West 2016)) and to issue a written decision upon request of the applicant or an adversely affected party (*id.* § 12(11)). Here, the Board members each explained their rationales as they voted, and neither Advocate nor Centegra requested that the Board issue a written decision. Further, "[w]here the testimony and documentary evidence is preserved in the record, a reviewing court has a sufficient factual basis upon which to determine whether an agency's decision is manifestly erroneous without the need for the agency to specify any factual basis for its decision." *Mercy Crystal Lake*, 2016 IL App (3d) 130947, ¶ 20. As such, under the circumstances in the present case, we reject Advocate's argument that the Board was required to provide a more detailed rationale for its decision.

¶ 41    Centegra argues that the Board arbitrarily disregarded its own regulations. Centegra addresses each unmet criterion and argues that the Board did not give an explanation as to each when it voted to approve the project. Centegra is essentially arguing that the Board's decision should be reversed because there was no justification for approving the application in light of the degree of variance from the unmet review criteria. However, "neither the number of negative criteria nor the relative importance of the particular negative criteria have any bearing on whether Board approval of an application was clearly erroneous." *Id.* ¶ 22. Further, "[i]t is not this court's function to reweigh the evidence; our review is limited to determining whether the Board's decision is clearly erroneous." *Provena Health*, 382 Ill. App. 3d at 47. " 'The mere fact that an opposite conclusion is reasonable or that a reviewing court might have ruled differently will not justify reversal of the administrative findings.' " *Id.* (quoting *Cathedral Rock of Granite City, Inc. v. Illinois Health Facilities Planning Board*, 308 Ill. App. 3d 529, 545 (1999)).

¶ 42    Centegra asserts that the Board's decision was arbitrary and capricious because the bed count did not "substantially comply" with the bed-requirement criterion. In arguing that substantial compliance with the applicable review criteria is required, Centegra cites *Felle v. Metropolitan Sanitary District of Greater Chicago*, 167 Ill. App. 3d 121, 126 (1988). In that case, the court reviewed a decision of the Metropolitan Sanitary District's civil service board. *Id.* at 122. At issue was whether the board had followed a certain personnel rule. The reviewing court noted that an administrative agency must follow its own rules, but that it needs "to comply only substantially with the relevant statutory requirements in issuing reports." *Id.* at 126. The reviewing court held that the board had substantially complied with the personnel rule, and it affirmed the board's decision. *Id.* at 127.

¶ 43    Centegra's reliance on *Felle* is unpersuasive. In *Felle*, there was no indication that the civil service board had a rule similar to the rule set forth in section 1130.660(a) of the Illinois Administrative Code (77 Ill. Adm. Code 1130.660(a) (2016)), which allows for the approval of an application even if all the review criteria are not met. In other words, the board did not have a similar rule granting it discretion in applying its own rules. There is simply no legal support for the proposition that Mercy's application had to substantially comply with all the review criteria.

¶ 44                                          CONCLUSION

¶ 45          For the foregoing reasons, we reverse the judgment of the circuit court of McHenry County and affirm the decision of the Board.


¶ 46          Circuit court judgment reversed.

¶ 47          Board decision affirmed.