2020 IL App (2d) 191145-U
Nos. 2-19-1145 & 2-20-0221, cons.
Order filed November 12, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| ANTHONY J. TROTTO, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19-MR-770 |
| | ) | |
| CITY OF WOOD DALE, and CITY OF | ) | |
| WOOD DALE COMMUNITY | ) | |
| DEVELOPMENT DEPARTMENT, | ) | Honorable |
| | ) | Bonnie M. Wheaton, |
| Defendants-Appellants. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Zenoff and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The hearing officer's finding that the plaintiff was in violation of a city ordinance was clearly erroneous where the record showed the defendant was equitably estopped from enforcing the alleged ordinance violation.  The trial court did not abuse its discretion in denying the plaintiff's motion for attorney fees and costs.

¶ 2    On October 25, 2018, the defendants, the City of Wood Dale and the City of Wood Dale Community Development Department (collectively, the "City"), cited the plaintiff, Anthony Trotto, for allegedly violating an ordinance which required him to obtain a special use permit to lawfully make residential use of his property.  Trotto refused to obtain a special use permit and the

matter proceeded to an administrative hearing. Following the hearing, the hearing officer found in favor of the City, requiring Trotto to pay a fine and apply for a special use permit. Trotto appealed to the circuit court of Du Page County, which entered an order reversing the hearing officer's determination. The City appeals from this order. The trial court subsequently entered an order denying Trotto's postjudgment motion for attorney fees and costs. Trotto appeals from that order. We reverse the hearing's officer determination and affirm the trial court's denial of fees and costs.

¶ 3                                    I. BACKGROUND

¶ 4     Trotto purchased the subject property, located at 134 W. Irving Park Road, in May 2010. He proceeded to procure numerous building permits to renovate the property for residential use. He ultimately received an occupancy permit and moved into the home in October 2015. In early 2018, he applied for a building permit to replace some windows in the home. On April 9, 2018, he received a letter from Kelley Chrisse, the City's assistant community development director. The letter explained that the building permit was being denied on the basis that the existing residential use of the property was not legally authorized. The letter explained that, to use the property as a residence, Trotto was required to obtain a special use permit. A special use permit application was included with the letter. Trotto did not apply for a special use permit.

¶ 5     On October 25, 2018, the City sent Trotto a letter informing him that his property was commercially zoned and that his use of the property as a private residence violated section 17.503(L) of the City's municipal code (City of Wood Dale Municipal Code § 17.503(L) (adopted October 21, 2010)), which required a special use permit for residential use of the property. Included with the letter was a violation notice and a notice to appear for administrative hearing.

¶ 6     On April 23, 2019, an administrative hearing was held on the alleged code violation. The parties stipulated as follows. As of February 2007, the residential use of the subject property was a legal nonconforming use. Both then and in May 2010 when Trotto purchased the property, section 10.202 of the City's zoning code (City of Wood Dale Municipal Code § 10.202 (adopted October 7, 1993)), which addressed nonconforming buildings and uses, was in effect. Under section 10.202(B), a legal nonconforming use could be lost if the nonconforming use "ha[d] been discontinued for a period of twelve (12) consecutive months or whenever there [was] evident a clear intent *** to abandon." The property remained vacant from the time that the previous owner vacated the property, about February 2007, until Trotto moved in. Sections 17.301-17.305 of the City's municipal code went into effect on October 21, 2010, replacing section 10 of the City's old/former municipal code. City of Wood Dale Municipal Code §§ 17.301-305 (adopted October 21, 2010). The parties agreed that section 10.202 of the City's code applies to this case. Trotto does not possess and has not applied for a special use permit for the residential use of his property.

¶ 7     Gosia Pociecha testified that she was the City planner and had been for six months. She had reviewed the file regarding the subject property. In January 2007, the building was deemed unsafe for occupancy. At that time, the use of the property as a residence was considered a legal nonconforming use. A legal nonconforming use meant that a property owner could continue a specific use of his property without applying for a special use permit. The City's records indicated that the property was vacant as of February 12, 2007 and was vacant for at least 12 months thereafter. The property was located in a commercial district, known as the Town Center Business District (TCBD).

¶ 8     John Forrest testified that he was the City's community development director from about 2007 until March 2015. That position gave him the authority to determine whether or not a

property was occupied pursuant to its lawful use. Trotto's property was originally occupied as a single-family residence. The previous owner of the property, Zaki Labovsky, had lived there since about 1950, raised her family in the house and ran a dance studio in the building next door. At some point, the City received a complaint about the conditions of the house. At that time, Labovsky was about 80 years old and suffered from mild dementia. As a result of an inspection, he learned that Labovsky was a hoarder and that the house was filled from floor to ceiling with only small walking paths through the house. The hot water heater was also broken and the failure to fix it was a plumbing code violation. The determination was made to issue a citation declaring the house to be unsafe for occupancy.

¶ 9    After the house was cited, Trotto was not sure if Labovsky continued to live there. The City did not perform nightly checks on the house. Labovsky replaced the hot water heater and, over a period of time, was making progress on decluttering the house. Although the progress was excruciatingly slow, she made continuous efforts to maintain the use of the property as a single-family residence. In his opinion, Labovsky never showed an intention of abandoning the house and the use as a single-family residence was never discontinued. At some point, the home was placed on the market for sale. He believed it was marketed as a single-family residence.

¶ 10    Forrest remembered having correspondence concerning the residence with Trotto. Forrest identified a December 22, 2010, letter he wrote to Trotto in response to inquiries that were made by Trotto concerning the permitted use of the property. In the December 2010, letter, Forrest addressed the existing building code violations on the property and what needed to be done before the property could be reoccupied. He testified that he was essentially communicating to Trotto that the property could continue to be used as a single-family residence. He told Trotto that it was in the best interest of the City for the property to continue being used as a single-family residence

if Trotto was willing to make the necessary improvements. Forrest testified that the City manager, attorney, alderman, and mayor were all copied on this correspondence. In 2010, the consensus of the City's administration and elected officials was to restore the appearance of structures in the TCBD. Forrest testified that he was communicating with Trotto as a village official and was communicating the City's policy that the property at issue had maintained its status as a legal nonconforming use notwithstanding that the property had been vacant for a year. The City had never taken the position that the legal nonconforming use was abandoned, forfeited, or discontinued. Forrest interacted with Trotto at all times with the belief that the legal nonconforming use had never been lost.

¶ 11    Forrest identified the City's ordinance on code enforcement. Part of the process of issuing a permit was ensuring that a property was being used consistent with its zoning. Forrest acknowledged that he had issued multiple building permits to Trotto from 2010 through 2014 with the understanding that Trotto would be able to occupy the property as a single-family home pursuant to a lawful nonconforming use. By issuing the occupancy permit to Trotto in 2015, Forrest, through his office, determined that use as a single-family residence was a lawful use of the property.

¶ 12    On cross-examination, Forrest acknowledged that in an August 11, 2010, letter to Trotto he stated that the residential use of the property might be considered a nonconforming use because it had not been occupied in more than a year. Forrest testified that the property was vacant from the time it was cited as unsafe in 2007 until at least December 22, 2010. However, there was continuous work being done by both owners to clean up the property. Labovsky was there regularly going through her belongings. After Trotto purchased the property in May 2010, he continually worked toward renovating the property for use as a single-family residence.

¶ 13 Kenneth Johnson testified that he was a City alderman for 10 years and then served as mayor for 13 years, until 2011. He was the mayor in December 2010. He testified that Forrest's role as the City's community development director gave Forrest the authority to make determinations as to whether a property was being lawfully used based on the City's ordinances. Johnson testified that he was copied on Forrest's December 22, 2010, letter to Trotto. He believed that Forrest was communicating that the City preferred for Trotto to renovate the property for continued residential use rather than the City pursuing a declaration that the property's legal nonconforming use had been abandoned. During his tenure as mayor, the City never believed that the legal nonconforming use of the property had been discontinued. The City always intended for the property to be used as a single-family residence.

¶ 14 Roy Wesley testified that he lived on Irving Park Road, two or three blocks from the property at issue, for 32 years. He had been an alderman for ten years, since 2010. He testified that the policy of the City was always to support Trotto's continued use of the property as a single-family residence.

¶ 15 Trotto testified that he purchased the subject property on May 5, 2010. He knew Labovsky for years because his law office was next door, at 138 Irving Park Road. The property was listed for sale about June 8, 2007. The MLS listing stated that the property was "Office/Tech" and Trotto testified that, to his knowledge, the MLS listing was correct. He closed on the property on May 5, 2010. Labovsky had expressed an interest in renting the home from Trotto after he renovated it. She died after he purchased the property but before he had completed the renovations.

¶ 16 Trotto testified that, prior to purchasing the house, he was aware that its residential use was a legal nonconforming use. He knew that the January 2007 citation stated that, if the unsafe conditions were corrected, re-occupancy was allowed. He had regular conversations with Forrest

after he purchased the property. Trotto testified that he received ten building permits from Forrest and spent over $200,000 on renovations with the understanding that the purpose of the work was to improve the property as a single-family residence and that its use as a residence was a legal nonconforming use. He had always communicated to Forrest that he intended to use the property as a residence, and he relied on Forrest's representations that the property retained its status as a legal nonconforming use. When he received the building permits and occupancy permit, he regarded those as certification that the use of the property was a legal nonconforming use. One of the permits was for general remodeling for three bedrooms and two bathrooms. He was not aware of any other use that would allow three bedrooms other than a residential use.

¶ 17    Trotto further testified that, in 2018, he sought a building permit to replace basement and second floor windows. The community development director at the time, Kelley Chrisse, denied the permit. The basis for the denial was her belief that he had to apply for a special use permit. He disagreed and appealed to the Building Code Board of Appeals (Board). After a hearing, the Board granted his appeal and issued his requested building permit. He never had to apply for a special use permit. He believed that the issue decided by the Board was that his residence was still a legal nonconforming use.

¶ 18    The record includes a letter, dated August 11, 2010, from Forrest to Trotto. The letter states:

> "Though the house might be considered a non-conforming use that has not been occupied for more than a year, and subject to elimination of the non-conforming status per the current Zoning Ordinance "Non-Conforming Structure" section, it appears the B-4 allowable "Special Uses" can allow its reoccupancy as a residential dwelling."

Thereafter, Forrest detailed the unsafe conditions on the property and noted that those conditions would need to be resolved before the City could issue an occupancy permit.

¶ 19 Also included in the record is the December 2010 letter, from Forrest to Trotto. In that letter, Forrest explained that the property had been cited for unsafe conditions on January 9, 2007, and that the residence had been unoccupied since that time. Forrest stated that "the City could make the argument that [as the home has] been vacant for three plus years, any non-conforming status [it] enjoyed has now expired per *** Section 17.304[(C)(5)(b)]. It is not the intention of this department to pursue this course of action at this time as restoration of [this structure], and reoccupancy, seems more advantageous not only to the City, but to you as the owner." The letter went on to address issues related to the renovation of the residence.

¶ 20 In closing argument, Trotto argued that the residential use of the subject property was never discontinued or abandoned, and it was still a legal nonconforming use. Alternatively, he argued that even if the legal nonconforming use was lost, the City should be barred, by the doctrines of equitable estoppel and *laches*, from enforcing the zoning ordinance requiring a special use permit. Trotto also argued that the issue was *res judicata* because, with respect to his 2018 building permit for windows, the Board granted his appeal because it determined that the legal nonconforming use of his residence had not been discontinued or abandoned. The City argued that the house had lost its status as a legal nonconforming use because it was vacant for over eight years, and during that time it was uninhabitable and unsafe. On May 28, 2019, the hearing officer entered a written order finding Trotto liable for his failure to obtain a special use permit for the residential use of his property, in violation of § 17.503(L) of the City code, and imposed a fine of $500. The order was a form order with no explanation of the hearing officer's reasoning or any findings of fact.

¶ 21    Trotto appealed this decision in the circuit court of Du Page County.  On December 5, 2019, following a hearing, the trial court reversed the decision of the hearing officer.  The trial court found that the administrative decision was clearly erroneous and against the manifest weight of the evidence.  The trial court noted that Forrest, Johnson, and Wesley all testified that the residential use of the property was never discontinued.  The trial court found that the prior owner, Labovsky, did not voluntarily discontinue or abandon the residential use of the property.  The trial court also found that the City was equitably estopped from asserting that the residential use was discontinued because, for 11 years, it had not taken any affirmative action to enforce the zoning code.  The trial court found that *laches* also barred the City from asserting the zoning code violation because a significant number of building permits had been issued for the property.  Finally, the trial court found that the decision of the Board, with respect to the 2018 window permit, precluded any further litigation of the issue of whether the property could be occupied as a single-family home without a special use permit.  Thereafter, on December 30, 2019, the City filed a timely notice of appeal, which was docketed in this court as case no. 2-19-1145.

¶ 22    Also, on December 30, 2019, Trotto filed a motion for attorney fees and costs pursuant to section 5-120.5 of the Code of Civil Procedure (Code) (735 ILCS 5/5-120.5 (West 2018)).  That section of the Code provided that, if a court reverses the decision of a hearing officer in an administrative review action, in cases where the hearing officer imposed a fine against the owner of a single-family residential dwelling, the court may award the plaintiff reasonable court costs and attorney fees if the decision of the hearing officer was arbitrary and capricious.  *Id.*  Trotto argued that the decision of the hearing officer was arbitrary and capricious because it ran counter to the evidence presented at the hearing.

¶ 23    On February 6, 2020, the City filed a response to the motion for attorney fees. The City argued that the motion for fees must be denied for multiple reasons. First, the City argued that Trotto forfeited the issue because he had not argued, at the hearing before the trial court, that the hearing officer's decision was arbitrary and capricious, and it was improper to raise a new argument in a postjudgment motion. The City also argued that since it already filed a notice of appeal, the trial court was without jurisdiction to modify its judgment. The City further argued that the hearing officer's decision was not arbitrary and capricious because there was case law to support the hearing officer's decision. Finally, the City argued that even if the hearing officer's decision was arbitrary and capricious, the request for fees should be denied because the hearing officer's decision was grounded in a good faith interpretation of existing case law and was not the type of willful disregard of the law and facts that would warrant the imposition of attorney fees.

¶ 24    On March 2, 2020, following a hearing, the trial court denied the motion for attorney fees. The trial court found that the issue had been forfeited because Trotto had not argued at the hearing on his complaint for administrative review that the hearing officer's decision was arbitrary and capricious. Even absent forfeiture, the trial court found that the hearing officer's decision was not arbitrary and capricious. Trotto filed a timely notice of appeal from this order. The appeal was docketed in this court as case no. 2-20-0221. On August 3, 2020, upon motion of the parties, this court entered an order consolidating appeal nos. 2-19-1145 and 2-20-0221 for argument and decision.

¶ 25                                   II. ANALYSIS

¶ 26                               A. Appeal No. 2-19-1145

¶ 27    On appeal, the City argues that the trial court erred in reversing the decision of the hearing officer. The City contends that there was evidence to support a determination that the property at

issue had lost its status as a legal nonconforming use. The City further argues that it is not barred, by equitable estoppel, collateral estoppel, or *laches*, from enforcing the zoning regulations and requiring Trotto to obtain a special use permit. We need only address the issue of equitable estoppel, as it is dispositive of this appeal.

¶ 28    In administrative cases, we review the decision of the administrative agency and not the ruling of the circuit court. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006). The degree of deference afforded to the administrative agency's decision depends on whether the question considered is a question of fact, a question of law, or a mixed question of law and fact. *Id.* at 532. A question of fact is reviewed under the manifest weight of the evidence standard, which asks whether the opposite conclusion is clearly apparent. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). If the record contains evidence supporting the administrative agency's findings of fact, those findings should be affirmed. *Cathedral Rock of Granite City, Inc. v. Illinois Health Facilities Planning Board*, 308 Ill. App. 3d 529, 542 (1999). A question of law is reviewed *de novo*. *City of Belvidere*, 181 Ill. 2d at 205.

¶ 29    A mixed question of law and fact, which involves an examination of the legal effect of a given set of facts, is reviewed under the clearly erroneous standard. *Marconi*, 225 Ill. 2d at 532; *Pedersen v. Village of Hoffman Estates*, 2014 IL App (1st) 123402, ¶ 52. A decision is clearly erroneous "where the reviewing court, on the entire record, is 'left with the definite and firm conviction that a mistake has been committed.'" *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). The parties agree that the clearly erroneous standard of review applies in this matter.

¶ 30     On appeal, the City argues that it is not equitably estopped from enforcing the zoning ordinance requiring Trotto to obtain a special use permit. First, the City argues that there was no affirmative act by the City that induced a substantial change in Trotto's position. The City notes that Trotto is an attorney and real estate broker, the property was listed on the MLS as an "Office/Tech" building, and letters from Forrest to Trotto in August and December 2010, stated that the property might have lost its legal nonconforming status because the property was vacant for over three years. The City also argues that there was no justifiable reliance. The City asserts that Trotto would have been required to make the renovations to the property regardless of the reason for occupancy and that he is still entitled to use the property as a residence as long as he obtains a special use permit.

¶ 31     Trotto argues that the City is equitably estopped from asserting that a special use permit is required to make lawful use of his residence. Trotto notes that between December 2010 and March 2015, the City issued nine building permits upon which he relied in expending over $225,000 on improvements to the property. Trotto argues that he improved the subject property in reliance on the December 2010 letter, which stated that the City preferred the property to be renovated and occupied as a single-family residence rather than pursuing a determination that its legal nonconforming status had expired. Trotto argued that Forrest, as the community development director, had the authority to determine the proper legal use of the property.

¶ 32     The doctrine of equitable estoppel is applicable to municipal bodies. *Kenny Construction Co. of Illinois v. Metropolitan Sanitary District of Greater Chicago*, 52 Ill. 2d 187, 197 (1971). Although a municipal body generally cannot be estopped by an act of its agent beyond the authority conferred upon that agent, that general rule is qualified and a party may invoke the doctrine of equitable estoppel against a municipality where: (1) "his action was induced by the conduct of

municipal officers," and (2) "in the absence of such relief he would suffer a substantial loss and the municipality would be permitted to stultify itself by retracting what its agents had done." *Cities Service Oil Co. v. City of Des Plaines*, 21 Ill. 2d 157, 161 (1961). The question of whether estoppel should be applied against a municipality in a particular case must be made on an individual basis, after considering all of the circumstances of the case. *Stahelin v. Board of Education, School District No. 4*, 87 Ill. App. 2d 28, 39 (1967). "If under all of the circumstances, the affirmative acts of the public body have created a situation where it would be inequitable and unjust to permit it to deny what it has done or permitted to be done, the doctrine of estoppel may be applied against it." *Id.*

¶ 33 The leading Illinois supreme court case on the doctrine of estoppel as applied to municipalities is *Cities Service*. In that case, the owner of property in the city of Des Plaines had obtained a building permit for the construction of a gas station. *Cities Service*, 21 Ill. 2d at 158-59. The property was subsequently sold to the plaintiff and the building commissioner approved the transfer of the permit to the plaintiff. *Id.* at 159. The plaintiff thus commenced construction of the gas station. About three weeks later, Des Plaines stopped the work and the mayor subsequently revoked the permit because the gas station would be less than 300 feet from a church, which violated a zoning ordinance. *Id.* By that time, the plaintiff had invested over $5,000 in the project and would have to spend over $1,000 more to remove the improvements. *Id.* at 159.

¶ 34 The plaintiff brought suit against Des Plaines to enjoin enforcement of the ordinance. The evidence showed that, prior to starting construction, the plaintiff had tried to obtain copies of ordinances relating to service stations, but Des Plaines had given it an outdated ordinance, which prescribed only a 100 feet distance. *Id.* at 159-60. Consequently, the plaintiff had no knowledge that the location of the service station was in violation of the ordinance. In addition, evidence

introduced at trial showed that the operation would not create a greater hazard to the health and safety of the public than other permitted uses of property in the vicinity. *Id.* at 160. The trial court held that Des Plaines was estopped from enforcing the ordinance, reasoning that construction was initiated by the plaintiff upon "affirmative action and apparent approval by the public authorities." *Id.* at 159.

¶ 35   On appeal, our supreme court affirmed the trial court's determination. The court reiterated the general principles that "a city cannot be estopped by an act of its agent beyond the authority conferred upon him"; that anyone dealing with a governmental body has the burden of assuring that the agents of that body act within their bounds; and that this is true even if the agent is unaware of the limits on his or her authority. *Id.* at 160-61. The court further explained that "[i]n matters involving strictly public rights the courts do not interpose to hold the municipality estopped except under special circumstances which would make it highly inequitable or oppressive to enforce such public rights." *Id.* at 161. Such special circumstances exist where a party's "action was induced by the conduct of the municipal officers and where in the absence of such relief he would suffer a substantial loss." *Id.* Based on these principles, the court held that it would be inequitable to require the plaintiff to remove the improvements, noting that the plaintiff had "expended large sums of money in reliance upon the permit and the apparent acquiescence by [Des Plaines'] officials;" the improvements were made in good faith after the plaintiff was induced to believe that no violation of the law existed; and the permit remained outstanding for seven months before it was revoked. *Id.* at 163.

¶ 36   In so ruling, the court acknowledged that if a party is aware of an ordinance or makes no attempt to learn of the applicable ordinances, the issuance of a permit in violation thereof will not result in a finding that the city is estopped from revoking the permit. Moreover, even in the absence

of such knowledge, "the mere issuance of an unauthorized permit and reliance thereon to one's injury does not provide grounds for relief." *Id.* Despite these tenets, the court found that the circumstances warranted application of the doctrine of equitable estoppel against Des Plaines because Des Plaines had essentially ratified the issuance of the permit to build a service station by failing to act to revoke the permit for seven months. *Id.*

¶ 37     As in *Cities Service*, we hold that the circumstances in the present case are sufficient to justify the application of the doctrine of equitable estoppel. Prior to purchasing the property, Trotto did research and was aware that the residential use of the property was a legal nonconforming use. Forrest and Johnson, the former mayor, both testified that Forrest's position as the community development director gave him the authority to make determinations as to the lawful use of property. While the August and December 2010 letters indicated that the City could assert that the legal nonconforming use had expired, it was also specifically stated in the December 2010 letter that the City was not pursuing that course of action. Forrest and Johnson testified that, in 2010, the consensus of the City's administration and elected officials was to restore the appearance of structures in the TCBD and thus allow Trotto to renovate the home for single family residential use.

¶ 38     Further, Forrest testified that, in all his interactions with Trotto, he made it clear that the City was taking the position that the property had not lost its legal nonconforming status. The mayor, the alderman, the city manager, and the city attorney were all aware of and in agreement with this determination. In reliance upon the City's representations that the property had not lost its status as a legal nonconforming use, Trotto spent over $225,000 improving the property with the intent to use it as a residence. Trotto made these expenditures in good faith, based on the City's representations. Forrest issued nine building permits, which was within his authority to do, all

with the knowledge that Trotto was planning to use the property as his residence. The evidence shows that Forrest's actions were affirmative acts of the City, Trotto acted in reliance on the assertions that the property maintained its legal nonconforming status, and that Trotto substantially changed his position by expending large sums of money to renovate the property for residential use. Accordingly, equitable estoppel is warranted in this case because, under the circumstances, the City had essentially ratified a determination that Trotto could continue to use the property for residential purposes without a special use permit. *Id.*

¶ 39     The City argues that there is no substantial loss because Trotto can apply for a special use permit and continue to use the property as a residence. However, the City ignores the fact that the application for a special use permit can be denied. Further, the City's argument that there has been no monetary loss because Trotto can still use the property for commercial use is disingenuous. Trotto expended significant sums renovating the property for residential use, including remodeling bedrooms, bathrooms, and a kitchen. It is axiomatic that renovations for a commercial use would likely have been different.

¶ 40     The City relies on *Morgan Place of Chicago v. City of Chicago*, 2012 IL App (1st) 091240, and *City of Chicago v. Unit One Corp.*, 218 Ill. App. 3d 242 (1991), in arguing that the application of equitable estoppel is not warranted in the present case. Both of those cases are distinguishable. In *Morgan Place*, the court determined that Chicago was not equitably estopped from revoking a reinstated building permit. *Morgan Place*, 2012 IL App (1st) 091240, ¶ 38. In making its determination, the court explained that there was evidence that the plaintiff actually or constructively knew its building permit for residential development was issued in violation of an ordinance. *Id.* Further, the record showed that Chicago's agent who had reinstated the permit did not have the authority to do so in light of the zoning violation; even after the permit was reinstated

Chicago took action to persuade the plaintiff to cease construction; and public policy would be frustrated by the plaintiff's construction on the property. *Id.* ¶¶ 39-40. These considerations are not at issue in the present case because the evidence showed that Trotto believed the property maintained its legal nonconforming use, the City's actions demonstrated that it acquiesced in this determination, Forrest at all times acted within his authority, and there was no evidence that allowing the property to maintain its status as a legal nonconforming use violated any public policy. In fact, Johnson testified that at the time Trotto purchased the property, the policy of the City was to always designate the property for residential use.

¶ 41    In *Unit One*, Chicago had issued permits for 15 years for a property owner to maintain commercial signs on the exterior wall of its building. *Unit One*, 218 Ill. App. 3d at 244. When Chicago eventually filed a complaint alleging that the signs violated its zoning ordinance, the reviewing court ruled in favor of Chicago, holding, in part, that it was not estopped from enforcing its zoning ordinance. *Id.* at 247. The court noted that there was no evidence that Chicago actively misled or induced Unit One into believing that no violation of the sign ordinance was involved, and that the permit stamp contained language that the permit could not be considered an approval of any violation of the zoning ordinance. *Id.* Based on these circumstances the court held that Unit One should not be relieved of its own responsibility to know the limitations of any applicable ordinances. *Id.*

¶ 42    The court also found that there was no substantial reliance as Unit One had not shown that it substantially changed its position because of the unauthorized sign permits. *Id.* The condominium building was not constructed in reliance upon the belief that commercial signs would be permitted and there was no indication that the commercial space in the building was designed in reliance upon the sign permits. The court further held that there was no substantial loss in

reliance because Unit One would be in the same position it would have been had it always complied with the ordinance. *Id.*

¶ 43    *Unit One* is distinguishable because, in that case, the court specifically noted that Chicago did not actively mislead or induce Unit One.    However, in the present case, the City's representations induced Trotto to spend substantial sums of money renovating the property for residential use.    Further, while the *Unit One* court found no substantial reliance, the evidence in the present case demonstrated that Trotto relied on the City's representations that the property had not lost its status as a legal nonconforming use.    Finally, while there was no evidence in *Unit One* that the building was constructed in reliance on commercial signs being permitted, there is evidence in this case that the renovations to the home were made in reliance on the City's representations that it considered Trotto's residential use of the property to be a legal nonconforming use.

¶ 44    In summary, the City is equitably estopped from enforcing its zoning ordinance against Trotto and requiring him to obtain a special use permit.    Based on the record, the hearing officer's determination was clearly erroneous.    At oral argument, the City repeatedly noted that the hearing officer's determination must be affirmed if there was any evidence in the record that supported it. However, that principle applies to findings of fact.    *Cathedral Rock*, 308 Ill. App. 3d at 542.    In this case, the hearing officer ruled in favor of the City without setting forth any factual findings. Additionally, the facts in this case were essentially undisputed and our determination is not based on a reweighing of the facts.    Rather, we reverse the hearing officer because he clearly misapplied the law to the facts in this case.    As noted, because equitable estoppel is dispositive of this appeal, we need not address the City's remaining contentions on appeal.

¶ 45                              B. Appeal No. 2-20-0221

¶ 46    In this appeal, Trotto argues that the trial court erred in denying his motion for attorney fees and costs. Trotto argues that the issue was not forfeited, as it was proper to assert his motion for fees after the trial court entered its order reversing the hearing officer. Trotto further argues that the decision of the hearing officer was arbitrary and capricious, and he is entitled to attorney fees because there was no evidence to support the assertion that the legal nonconforming use was discontinued or abandoned.

¶ 47    The City argues that Trotto's motion for attorney fees was a postjudgment motion and that Trotto could not raise a new argument, namely that the hearing officer's determination was arbitrary and capricious, in a motion for rehearing. Thus, the City contends that Trotto forfeited his request for attorney fees and costs. The City further argues, that even absent forfeiture, the trial court properly denied Trotto's motion because the hearing officer's determination was not arbitrary and capricious as it was supported by evidence in the record.

¶ 48    Trotto filed his motion for attorney fees and costs pursuant to section 5-120.5(a) of the Code, which provides:

> "(a) In an administrative review action under Article III of this Code, if the court reverses the decision of a municipal code hearing officer in an action set forth under subsection (c) of this Section, then the court may award the plaintiff all reasonable costs, including court costs and attorney's fees, associated with the action if the court finds that: (i) the decision of the hearing officer was arbitrary and capricious; or (ii) the defendant failed to file a record under Section 3-108 of this Code that is sufficient to allow the court to determine whether the decision of the hearing officer was arbitrary and capricious." 735 ILCS 5/5-120.5 (West 2018).

Subsection (c) states that the statute applies to the decision of a hearing officer that imposes a fine against the owner of a single-family residential dwelling for a violation related to the condition or use of that residential property. *Id.* § 5-120.5(c).

¶ 49   At issue is whether section 5-120.5 required Trotto to file his motion for attorney fees with his original complaint for administrative review or whether the statute allowed his claim to be filed following the trial court's reversal of the hearing officer's decision.  The principles of statutory interpretation are well established.  The language of the statute is the most reliable indicator of the legislature's objectives in enacting a particular law, and we give statutory language its plain and ordinary meaning.  *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 216 (2008).  Where the language of a statute is clear and unambiguous, we must apply it without resort to further aids of statutory construction.  *Id.* at 217.  Moreover, "[w]e must not depart from the plain language of the [statute] by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent."  *Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 225 Ill. 2d 103, 117 (2007).  Finally, "words and phrases should not be construed in isolation, but must be interpreted in light of other relevant provisions of the statute."  *Id.*  Questions of law, such as those involving statutory construction, are reviewed *de novo*.  *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008).

¶ 50   Further, we note that "Illinois follows the 'American Rule,' which provides that absent statutory authority or a contractual agreement, each party must bear its own attorney fees and costs."  *Housing Authority of Champaign County v. Lyles*, 395 Ill. App. 3d 1036, 1038 (2009); see also *City of Champaign v. Madigan*, 2013 IL App (4th) 120662, ¶ 55 (noting "[w]here the General Assembly has intended to provide fees in administrative review proceedings, it has specifically done so").  "Statutes permitting the recovery of costs are in derogation of the common law and

must be strictly construed." *Negro Nest, LLC v. Mid-Northern Management, Inc.*, 362 Ill. App. 3d 640, 642 (2005).

¶ 51    In the present case, the trial court found Trotto's motion for attorney fees to be forfeited because Trotto had not argued that the hearing officer's decision was arbitrary and capricious at the original hearing.  In arguing that the issue was not forfeited, Trotto relies on *Illinois Department of Financial and Professional Regulation v. Rodriguez,* 2012 IL 113706.  At issue in that case was whether a fee petition under section 10-55(c) of the Illinois Administrative Procedure Act (5 ILCS 100/10-55 (West 2010)) must be filed while the court maintained jurisdiction over the original action or whether it created a separate cause of action such that the court retained indefinite jurisdiction to hear the fee petition.  Section 10-55(c) states:

> "In any case in which a party has any administrative rule invalidated by a court for any reason, including but not limited to the agency's exceeding its statutory authority or the agency's failure to follow statutory procedures in the adoption of the rule, the court shall award the party bringing the action the reasonable expenses of the litigation, including reasonable attorney's fees." *Id.*

¶ 52    Our supreme court held that the plain language of the statute, namely reading the phrase "[i]n any case" along with "the court," meant that the fee petition must be brought before the court that invalidated the rule, while that court maintained jurisdiction.  *Rodriguez*, 2012 IL 113706, ¶ 15.  Our supreme court further held that, under the plain language of the statute, the fee petition could have been filed along with the original complaint or shortly after the rule was invalidated while the ruling court retained jurisdiction.  *Id.* ¶ 27.

¶ 53    We find Trotto's reliance on *Rodriguez* persuasive.  Here, there is nothing in the plain language of section 5-120.5 of the Code that requires a motion for attorney fees and costs to be

filed with the complaint for administrative review. The statute specifies only that "in an administrative review action," "the court" may award the plaintiff reasonable costs. Thus, the plaintiff must file the motion for attorney fees and costs while the court that reversed the hearing officer's determination maintains jurisdiction over the action. *Id.* ¶ 15. Here, despite the City filing its notice of appeal, the trial court retained jurisdiction over the action. See *Herlehy v. Marie V. Bistersky Trust*, 407 Ill. App. 3d 878, 898 (2010) ("A circuit court has jurisdiction to entertain a motion for attorney fees filed within 30 days of the entry of a final judgment without regard to a previously filed notice of appeal"). Accordingly, while the motion for attorney fees and costs could have been filed with the original complaint for administrative review, there is nothing in the statute precluding it from being filed after the hearing officer's determination was reversed. *Id.* ¶ 27; see also *Town of Libertyville v. Bank of Waukegan*, 152 Ill. App. 3d 1066, 1073 (1987) (since statute did not set time limit for seeking attorney fees and costs, a litigant could pursue such expenses after judgment was entered).

¶ 54    The City also argues that the motion for fees was essentially a motion for rehearing or modification of the judgment as it required the trial court to make an additional factual finding that the hearing officer's determination was arbitrary and capricious. The City argues that it is improper to raise a new legal theory in postjudgment motion. This argument is without merit. A motion for attorney fees is not a post-trial motion directed against the judgment or a motion to modify the judgment. *F.H. Prince & Co., Inc. v. Towers Fin. Corp.*, 266 Ill. App. 3d 977, 983 (1994). Here, a decision as to whether the hearing officer's determination was arbitrary and capricious would not require the judgment to be modified. At issue before the trial court was whether the hearing officer erred. The standard of review required a determination only as to whether the hearing officer's decision was clearly erroneous. Whether a decision was clearly

erroneous and/or arbitrary and capricious are two separate arguments with distinct legal analysis. See *Centegra Hospital-McHenry v. Mercy Crystal Lake Hospital and Medical Center, Inc.*, 2019 IL App (2d) 180731, ¶¶ 26-27. The trial court thus erred in finding that Trotto had forfeited his request for attorney's fees and costs. *Rodriguez*, 2012 IL 113706, ¶ 15.

¶ 55 We now turn to whether the trial court erred in finding that, even absent forfeiture, the hearing officer's decision was not arbitrary and capricious. When a court with proper statutory authority to award attorney fees exercises that authority, we review its decision under an abuse-of-discretion standard. *Grate v. Grzetich*, 373 Ill. App. 3d 228, 231 (2007). "A trial court abuses its discretion when its finding is against the manifest weight of the evidence [citation], or if no reasonable person would take the view adopted by it." *Technology Innovation Center, Inc. v. Advanced Multiuser Technologies Corp.*, 315 Ill. App. 3d 238, 244 (2000). An administrative decision is arbitrary and capricious where the agency "(1) relies on factors which the legislature did not intend for the agency to consider; (2) entirely fails to consider an important aspect of the problem; or (3) offers an explanation for its decision which runs counter to the evidence before the agency, or which is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Centegra*, 2019 IL App (2d) 180731, ¶ 27.

¶ 56 In the present case, we cannot say that the trial court abused its discretion in denying Trotto's motion for attorney fees. While we determined that the hearing officer misapplied the law to the facts of this case, there is no evidence that the hearing officer relied on improper factors, failed to consider important criteria, or that his determination was so implausible as to be arbitrary and capricious. We thus affirm the trial court's decision.

¶ 57                                        III. CONCLUSION

¶ 58 For the reasons stated, the judgment of the circuit court of Du Page County is affirmed.

¶ 59    Affirmed.